# ROBERT CALIENDO, ESQ.

Tel. (646) 668-5615
rc@caliendo-law.com
www.caliendo-law.com

August 19, 2023

**BY ECF**

Hon. Hector Gonzalez
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re:    *U.S. v. Domenick Ricciardo,* 21 CR 466

Dear Judge Gonzalez:

Counsel respectfully opposes the government's motion to award John Doe $624,000 in restitution. ECF No. 500. By contrast, the Court should adopt "the known loss of $280,890" as contemplated in the plea agreement, falling within the applicable guideline. ECF No. 500 at 3; ECF No. 500-2 (chart tallying bank withdrawals); USSG § 2B3.l(b)(7)(C) ("[m]ore than $95,000 [and less] than $500,000"). The Court should not rubber stamp Doe's conclusory affidavit while rejecting a banking-records figure actually grounding in preponderant evidence.

## Prior Proceedings

On June 6, 2023, the Court "sentence[d Domenick] to a period of incarceration of 28 months, followed by two years of supervised release." Sentencing Transcript at

45 ("Sent. Tr."). Domenick is presently confined at FCI Butner. The parties disputed restitution so the Court decided "not [to] deal with restitution [that] day[, giving] the Government an opportunity to submit sufficient support for the $624,000 figure … during that 90-day period." Sent. Tr. at 12.

Before plea, counsel argued to the government that Domenick should be accountable for payments he couriered. "Beginning in or about January 2020, VINCENT RICCIARDO and UVINO visited CS-1 at CS- 1's home and informed CS-1 that CS-1 would need to begin making regular payments." RUSSOETAL000013913. $2,600 payments occurred in 2020, in February, April, May, June, and July, totaling $13,000.[1] The government argued a conspiracy reaching back to 2001, albeit without Domenick, and highlighted bank withdrawals to 2011. Putting aside that bank records don't speak to what was foreseeable to Domenick, the parties abandoned those respective argument bookends, and negotiated a deal.

And the parties didn't merely settle on a "loss that exceeded $95,000," as characterized by the government. ECF No. 500 at 3. The plea agreement enhanced two-points for loss "[m]ore than $95,000 [and less] than $500,000." USSG § 2B3.l(b)(7)(C) (robbery table controlling extortion cases); Sent. Tr. at 8-9 (government assertion that "[w]e used a number … that was based on amounts that could be seen just from the

---

[1] There was no March 2020 payment because of COVID. And, "[b]eginning in or about August 2020, law enforcement officers have provided CS-1 with the funds to make the extortion payment to DOMENICK RICCIARDO," thus no loss occurred afterward. RUSSOETAL000013913-RUSSOETAL000013914.

2

victim's bank records"); PSR ¶ 42 ("the loss to John Doe was approximately $312,000, which is greater than $95,000 but less than $500,000").[2]

The government's sentencing memo didn't mention restitution. ECF No. 472. After "the disclosure of the PSR, the Probation Department learned from the case agent that John Doe One is requesting restitution in the amount of $624,000." PSR Addendum (June 1, 2023). On Aug. 10, 2023, the government filed an affidavit wherein Doe hand wrote a conclusory dollar amount into a preprinted form and signed his name, adding no additional information. ECF No. 500-1.

## Legal Standard

"Restitution … is the amount of loss caused by the specific conduct that is the basis for the conviction." *U.S. v. Campbell*, No. 21-CR-478 (FB), 2023 WL 2446256, *1 (EDNY Mar. 10, 2023) (citations and quotations omitted) ("[g]iven [factual] uncertainty, and because [he] served only as a low-level clerk in in the overall fraud scheme, the Court impose[d]" less restitution than the government sought). And Domenick can only be liable for restitution in amounts reasonably foreseeable. *U.S. v. Bengis*, 783 F.3d 407, 414 (2d Cir. 2015) (vacating restitution where, "[o]n the record before us, we cannot determine whether [defendant], when he joined the conspiracy in

---

[2] The "the known loss of $280,890" tallied in ECF No. 500-2 is more precise than Probation's $312,000 guesstimate. *Compare*, ECF No. 500 at 3 and ECF No. 500-2, *to*, PSR ¶ 41 ("in relying on John Doe One's bank records from 2010 through the conclusion of the extortion (of John Doe One's own money) in July 2020, the Government, using the metric of multiplying $2,600 per month over ten years' time, yielded a loss of approximately $312,000 to John Doe One").

1999, understood the scope of the conspiracy, such that he knew or should have known the extent of its adverse economic impact"). "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 USC 3664(e). "The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." *Id.*

## Argument

It's perfectly reasonable for the government to prioritize keeping a cooperator off the stand at a *Fatico* hearing. But the government cannot have it both ways and simultaneously demand a result they believe sworn testimony might have yielded. A conclusory affidavit skates past whether a self-interested cooperator is incorrect, mistaken, or untruthful. Only cross examination can test, for example, when payments began, under what circumstances, whether Doe was initially complicit, whether his salary was ever inflated beyond what he would have otherwise earned to account for such payments,[3] and whom if anyone else was involved. The affidavit is no substitute for reviewing Doe's 302s to determine what was previously said about his losses, origins of the scheme, or any attendant inconsistencies.[4] Plus, the affidavit does nothing to

---

[3] A theft of union funds can be distinct from extorting an initially complicit employee at different points in time.

[4] Counsel respectfully notes that if *any* witness made statements inconsistent with the government's position, that must be disclosed. "The government's obligation to disclose Brady evidence extends through sentencing." *Cardoso v. U.S.*, 642 F. Supp. 2d 251, 262 (SDNY 2009), *aff'd sub nom U.S. v. Solano*, 402 F. App'x 569 (2d Cir. 2010); *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963) (including that which "would tend to … reduce the penalty").

establish what was reasonably foreseeable to Domenick. Lawyer argument that 'come-on-he-must-have-known' flunks the government's burden.

True, courts have allowed affidavits to establish restitution. That doesn't mean any affidavit gets waved through. For example, *U.S. v. Gushlak* approved the practice. 728 F.3d 184, 193-94 (2d Cir. 2013) (also noting "[t]he Due Process Clause is plainly implicated at sentencing [including] restitution"); *U.S. v. Zakhary*, 357 f.3d 186, 191, n.4 (2d Cir. 2004) ("[t]o be sure, defendants have a due process interest in paying restitution").

But it was because the *Gushlak* "affidavits were asked to bear … *slight weight*" that the Second Circuit didn't "require[] expand[ing] the evidentiary hearings to include the live testimony and cross-examination of the affiants." 728 F.3d at 194 (emphasis supplied). *Gushlak* already had "two lengthy hearings" plus the affidavits. *Id.* By contrast, the instant affidavit proffers no "methodology" justifying loss or foreseeability, while purporting to establish all loss back to 2001. *Id.* at 188-202; *and compare to*, *id.* at 189 (methodology came from an expert who submitted a declaration, his "expert report and the testimony he gave at a hearing").

Similarly, in *U.S. v. Maurer*, the court was "not required … to hold a full-blown evidentiary hearing in resolving" restitution. 226 F.3d 150, 151 (2d Cir. 2000). There, a "trial record" – presumably with cross examination – "shed substantial light on the propriety of the restitution award" plus "a special conference for the purpose of determining the correct amount of loss for [] restitution" and then "a conference

5

devoted solely to restitution issues." *Id.* at 152; *see also, U.S. v. Sabhnani*, 599 F.3d 215, 258 (2d Cir. 2010) ("in their extensive trial testimony, [the victims] had covered substantially all the subjects raised … in their objections to the proposed restitution").

Additionally, counsel disputes the government's interpretation of the May 13, 2021 recording, citing six lines:

> V. RICCIARDO: Oh I know it did not stop. Why would you stop something when you got it coming out?
> UVINO: I mean [John Doe #1] said, no, I have always sent the money. And we said who? He said I was giving it to you, Cuzzin [Domenick Ricciardo].
> V. RICCIARDO: Yeah, when I first came home.
> UVINO: So, I'm sure he continued to send whatever he was sending so. I don't know what the number is but…
> V. RICCIARDO: Why would you stop it?
> UVINO: You wouldn't.

ECF No. 500 at 3.

These six attributions are taken from a longer, twenty-minute recording. *See*, Recording Bates Stamp No. NY_C-5JB_C-5JB-BR_2021_05_13T13_46_58 and Line Sheet Bates Stamp No. RUSSOETAL000012511. Domenick is not present and the words on tape are not his. His bracketed name appears next to "Cuzzin" because that's who the government asserts is referred to. And that twenty-minute recording is one of twelve different recordings made during the same meeting, spanning three and a half hours that day.

Regarding the six reprinted lines, the broader discussion concerns what Doe supposedly paid *another* unindicted person – not Vincent or anyone charged in 21 CR

466. Indeed, the first and the last three lines of the quoted exchange speculate about what Doe paid this *other* person. They are *not* commentary on if payments to Vincent stopped. Tellingly, Vincent, the extortion's supposed architect, doesn't know it's full scope. *See*, RUSSOETAL000012511 (Vincent and Uvino don't know "the number," trade possible theories, and confidently speculate that payments to this other person "did not stop"). Ironically, the government now urges the Court to speculate that Domenick knew complete scope back to 2001.

The entire thrust of the quoted exchange concerns this other person – not Domenick. They talk flippantly, quickly, and sometimes past each other. Indeed, the above transcription omits crucial cross-talk. Before Vincent says "[y]eah, when I first came home," Uvino says "for years." *Compare*, Recording Bates Stamp No. NY_C-5JB_C-5JB-BR_2021_05_13T13_46_58 *to* Line Sheet Bates Stamp No. RUSSOETAL000012511.[5] This undercuts the government's assertion "that Cuzzin picked-up payments when Ricciardo first came home from prison, which last occurred in 2008." ECF No. 500 at 3.[6] By contrast, the cross talk suggests that Vincent's comment about "when [he] first came home" relates to Uvino's remark about payments to "you," meaning Vincent, going back "for years" – not Domenick picking them up.

---

[5] The second line also omits the clause, "...said it the day we saw him…"

[6] Even if the government's "2008" reading was correct it doesn't corroborate involvement back to "January 1, 2001." ECF No. 500 at 3.

7

It would be a mistake to read more into the "Cuzzin" utterance because the discussion is wholly focused on this other person – not Domenick.

The government relies on *U.S. v. Germosen* to argue "the amount-of-loss calculation for purposes of sentencing does not always equal such a calculation for restitution." ECF No. 500 at 2, *citing* 139 F.3d 120, 130 (2d Cir. 1998). However, *Germosen's* logic on that score relies on inapt situations actually favoring defendants. For example, *Germosen* notes how "Sentencing Guidelines allow" for "intended loss" while restitution "requires … actual loss." 139 F.3d at 130. That's a scenario where restitution would be less, not more, than a plea-stipulated USSG amount. *Germosen* cites law "stating that the two calculations are closely related." *Id.* (citation omitted). By contrast, the government now pushes a restitution calculation more than doubling the bank-records figure.

*Germosen* stressed the importance of factoring a defendant's "ability to pay" into owed restitution, a metric supporting numbers even lower than the bank records amount. *Id.* at 131. And *Germosen* ultimately "remanded" the "restitution order [] for recalculation" because it included losses that "were not part of the offense of conviction." *Id.* Again, the guideline "loss," which "properly" included broader "relevant conduct," should have been *higher* than the restitution, not lower. *Id.*

8

Counsel joins the request to order Domenick's restitution "jointly and severally with any co-defendant convicted of" the same conduct. ECF No. 500 at 1, 4.[7] But that does not mean Domenick is necessarily liable for losses caused by others. *See, Campbell*, 2023 WL 2446256 at *2 (the "Government has failed to demonstrate … it would be reasonable to hold [two co-defendants] jointly and severally liable … with other participants … [for] the total loss amount caused by the scheme") (also tagging him with *less* restitution than he "agreed that he was individually accountable" for in "his plea agreement"). "If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 USC § 3664(h).

Payment schedule

In fixing repayment terms, Domenick respectfully asks the Court to consider his financial situation. Future employment prospects are essentially nil given his age, health, and felony conviction. He expects to continue receiving a monthly $2,361 net social

---

[7] *See also, U.S. v. James Beckish*, 17 CR 569, ECF No. 161 at 1 (SDNY 2019) ("liability for restitution shall be joint and several with that of any other defendant ordered to make restitution … should they be convicted under" this docket number); *U.S. v. Michael Mazzara*, 16 CR 576, ECF No. 270 at 2 (SDNY 2018) ("liability for restitution shall be joint and several with that of any other defendant ordered to make restitution for the offenses in this matter").

security[8] payment and a monthly $106 pension from his old doorman job. *U.S. v. Corbett*, 357 F. 3d 194, 196 (2d Cir. 2004) ("the restitution schedule [should make] allowance [] for reasonable living expenses").

Of course, "the court shall … specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of[, ]the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled[, and] projected earnings and other income of the defendant." 18 USC 3664(f)(2)(A) & (B). "A restitution order may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments." 18 USC 3664(f)(3)(B).

"A sentencing judge may not authorize a probation officer to dictate the amount of restitution or to establish a schedule for repayment of a restitution order." *U.S. v. Porter*, 90 F. 3d 64, 71 (2d Cir. 1996). And an "ambiguous [restitution schedule] is plain error." *U.S. v. Nucci*, 364 F. 3d 419, 422 (2d Cir. 2004).

---

[8] Counsel's understanding is that social security payments are paused in prison but can resume upon release. 42 USC § 402(x)(1)(A)(i) ("no monthly benefits shall be paid under this section or under section 423 of this title to any individual for any month ending with or during or beginning with or during a period of more than 30 days throughout all of which such individual is confined in a jail").

10

## Conclusion

Here, the Court should adopt the plea-bargained, evidence based $280,890 figure, rather than a bare-bones conclusory affidavit lacking normal guardrails to test cooperator assertions.

Respectfully,

*/S/ Robert Caliendo*

Robert Caliendo, Esq.
Tel. (646) 668-5615
rc@caliendo-law.com

*Counsel for Domenick Ricciardo*