

U.S. Department of Justice

United States Attorney
Eastern District of New York

TH:DEL/MWG/ADR
F. #2020R00637

271 Cadman Plaza East
Brooklyn, New York 11201

December 5, 2023

By ECF

The Honorable Hector Gonzalez
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Ralph DiMatteo
              Criminal Docket No. 21-466 (S-1) (HG)

Dear Judge Gonzalez:

      The government respectfully submits this letter in advance of the sentencing hearing of the defendant Ralph DiMatteo. On July 6, 2023, DiMatteo pleaded guilty to one count of racketeering, in violation of 18 U.S.C. § 1962(c), in connection with multiple crimes that he committed as the consigliere of the Colombo organized crime family of La Cosa Nostra. For the reasons discussed below, the government submits that a sentence of 46 months' imprisonment, which falls within the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of imprisonment, would be sufficient, but not greater than necessary, to achieve the goals of sentencing set forth at 18 U.S.C. § 3553(a). The government also asks the Court to impose three years' supervised release and award restitution to John Doe #1 in the amount of $280,890, to be paid jointly and severally with any co-defendant convicted of extorting John Doe #1.[1]

I.    Background

    A.    The Offense Conduct

      The Colombo organized crime family of La Cosa Nostra is a criminal enterprise that engages in violent crimes, extortion, loansharking, drug trafficking and fraud, among other crimes. See Presentence Investigation Report ("PSR") ¶¶ 8-19. To become an inducted member of the Colombo organized crime family, an individual must swear allegiance for life to the crime

---

[1] The Court entered an order awarding restitution to John Doe #1 in the amount of $280,890, to be paid jointly and severally with any co-defendant convicted of extorting John Doe #1, in conjunction with the judgment of co-defendant Domenick Ricciardo. See ECF Dkt. No. 518. The government seeks the same award here.

family above all else, and to follow all orders—including an order to commit murder—issued by the crime family boss. Id. ¶ 15. Defendant Ralph DiMatteo is a longtime inducted member of the Colombo organized crime family and, at all times relevant to the instant offense, served in the crime family's administration as its "consigliere"—its third most powerful member. Id. ¶ 20.

This case arises out of an investigation initiated in July 2020 by the Federal Bureau of Investigation ("FBI") and other law enforcement agencies into the extortion of John Doe #1, a senior official of a labor union based in Queens, New York (the "Labor Union") and others by members of the Colombo organized crime family. PSR ¶ 7. As described in the PSR, the scheme involved threats of violence toward multiple victims connected to the Labor Union and associated health fund (the "Health Fund").

The PSR details the breadth and nature of the Colombo crime family's extortion scheme against John Doe #1. The extortion of John Doe #1 began in 2001 and principally entailed defendant and Colombo crime family captain Vincent Ricciardo collecting $2,600 monthly from John Doe #1's salary, a sum which Ricciardo sometimes referred to as a "pension" for himself from the Labor Union. PSR ¶¶ 34-35. In 2020, members and associates of the Colombo crime family approached John Doe #1 in a grocery store, appeared at his home while his family was present, visited his Labor Union workplace, forced him to attend meetings with members of the crime family, and repeatedly and frequently called and texted him in connection with the extortion. Id. ¶¶ 36-46, 48-49. Between 2001 and 2020, John Doe #1 paid more than $600,000 to the members of the Colombo crime family in connection with the extortion. Id. ¶ 46. Bank records obtained from financial institutions since 2010 corroborate these payments. Id.

These threats of violence were designed to force the Labor Union's management to make decisions that benefited the Colombo organized crime family, to manipulate the selection of the Health Fund's vendors so that the Health Fund would contract with entities and individuals associated with the Colombo organized crime family, and to divert more than $10,000 per month from the Health Fund's assets to members of the Colombo organized crime family. PSR ¶¶ 30, 47.

As consigliere of the Colombo organized crime family, DiMatteo directly supervised Colombo captain Vincent Ricciardo, who led the efforts to infiltrate the Labor Union and Health Fund on behalf of the crime family. Intercepted calls pursuant to a judicially-authorized wiretap demonstrated that DiMatteo's leadership in the Colombo family's takeover of the Union and Health Fund. DiMatteo spoke regularly Vincent Ricciardo about his contacts with John Doe #1, and at one point, DiMatteo directed Vincent Ricciardo to go to Colombo boss Andrew Russo's home to discuss the scheme in person.

For instance, in mid-October 2020, during a meeting with Vincent Ricciardo, DiMatteo placed a call to a telephone used by Andrew Russo, the late boss of the Colombo crime family. While the telephone was ringing, and in the background, DiMatteo and Ricciardo can be heard talking with one another about how to pressure one of the consultants to the Health Fund who held valuable contracts that the administration was looking to re-bid and collect money from. During this conversation, Vincent Ricciardo told DiMatteo: "I got every-, I got where he lives, his social security number. He lives in his house, his wife's social security number. Big house." See PSR ¶ 53. Thus, Vincent Ricciardo appeared to have done research on the consultant so he could

physically threaten him or his family. When Russo came on to the phone, DiMatteo told him, "Monday, nobody's around" and then said, "I'm probably gonna take a ride with him anyway . . . . Just to see, just to see what's going on." After Russo responded in Italian, DiMatteo said, "I don't know yet. We're gonna go over it now," which was a reference to DiMatteo and Vincent Ricciardo discussing the Labor Union and Health Fund.

On November 5, 2020, Vincent Ricciardo met John Doe #1 and delivered a series of demands from the Colombo organized crime family. During the meeting, which was recorded, Ricciardo told John Doe #1, "[L]isten, you're gonna do what I tell you to do, cause I get told what to do." (emphasis added). Vincent Ricciardo reported to DiMatteo both before and after the meeting. Before the meeting, Vincent Ricciardo called DiMatteo and informed him that John Doe #1 did not want to meet with him. Following the meeting, Ricciardo called DiMatteo to relay what had transpired during the meeting and asked DiMatteo to meet in-person. See PSR ¶ 57.

On January 28, 2021, DiMatteo and Vincent Ricciardo discussed the crime family's effort to infiltrate the Labor Union and siphon money from the Health Fund. See PSR ¶ 63. In the following portion of the call, DiMatteo expressed his displeasure at the limited progress that Vincent Ricciardo had made:

> DIMATTEO: When are you coming here?
>
> V. RICCIARDO: I'm coming here in the middle of March.
>
> DIMATTEO: Middle of March, we're gonna wait a month and a half?
>
> V. RICCIARDO: Well things are going slow but they, they, they—I'm not all the way in there yet.
>
> DIMATTEO: Okay, that's no good buddy, you're gonna have to take a trip in, to say hello.
>
> V. RICCIARDO: Alright uh—
>
> DIMATTEO: Everything you, everything you said what's happening?   Nothing is happening?
>
> V. RICCIARDO: Of course not, it's going slow, but we're, we're partly in there.
>
> DIMATTEO: You're what?
>
> V. RICCIARDO: We're partly in there.
>
> DIMATTEO: Partly?
>
> V. RICCIARDO: Yes.

3

>                . . .
>
> DIMATTEO:       You know everything was left in your hands.
>
> V. RICCIARDO:   And I'm taking care of it little by little.
>
> DIMATTEO:       Okay that's what you wanted, correct? You want it to be in your hands?
>
> V. RICCIARDO:   Yes.

As shown above, DiMatteo was unhappy that Vincent Ricciardo was out of the New York area and was not moving quickly enough to expand the Colombo family's influence in the Union and Health Fund. Following the call, in another intercepted call, Vincent Ricciardo reported to a co-conspirator who ultimately provided information and cooperated with the government in the investigation ("Co-Conspirator #1") that DiMatteo wanted him to "come back," and referred to other statements that indicated that DiMatteo and other members of the Colombo crime family were impatient about the pace at which Vincent Ricciardo was proceeding.

A week later, on February 4, 2021, DiMatteo and co-defendant Richard Ferrara met with Co-Conspirator #1 in-person at a Brooklyn garage for another report. See PSR ¶¶ 63-64. Co-Conspirator #1 reported that DiMatteo instructed him to report to Ferrara, and Ferrara pledged his support for Ricciardo and the scheme.

Throughout the spring of 2021, Vincent Ricciardo continued to meet with DiMatteo in connection to the plan to infiltrate the Labor Union and Health Fund. As shown by law enforcement surveillance and intercepted telephone calls, DiMatteo attended meetings with Ricciardo and others on March 16, 2021; on March 23, 2021; on March 24, 2021; on April 13, 2021; on April 20, 2021; on April 27, 2021; and on June 6, 2021. See PSR ¶¶ 72-75, 77, 80-82. During these meetings, Vincent Ricciardo provided information and documents to members of the Colombo crime family. But DiMatteo did not only receive and relay reports. At one meeting in late April 2021, DiMatteo provided Ricciardo (via Michael Uvino) three copies of annually filed financial disclosure listing the Health Fund's assets and vendors in an effort to assist Ricciardo in implementing the takeover scheme.

DiMatteo also accepted payment connected to the Labor Union takeover on behalf of the Colombo crime family administration. PSR ¶ 98. In June 2021, at law enforcement's direction, Co-Conspirator #1 delivered an envelope containing a cash payment of $12,000 to Vincent Ricciardo and informed him that the money was from a consultant to the Health Fund who said: "I don't want anything to happen to my wife and brother." Id. Vincent Ricciardo immediately notified DiMatteo and requested a face-to-face meeting. Id. Vincent Ricciardo later recounted to Co-Conspirator #1, in a conversation that was consensually recorded, that DiMatteo had instructed Ricciardo to keep the money until the senior administration of the Colombo crime family decided to accept the $12,000 payment. Id. On June 29, 2021, in a Franklin Square parking lot, DiMatteo collected the money from Vincent Ricciardo and subsequently traveled to the Brooklyn garage to meet with other members of the crime family. Id.

4

B.    Procedural History

A grand jury in this District returned an indictment against DiMatteo and others on September 8, 2021.  DiMatteo was charged with the following crimes: (1) racketeering, in violation of 18 U.S.C. § 1962(c) (Count One); (2) Hobbs Act extortion conspiracy, in violation of 18 U.S.C. § 1951(a) (Count Two); (3) Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Count Three); (4) Hobbs Act extortion conspiracy, in violation of 18 U.S.C. § 1951(a) (Count Four); (5) attempted Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Count Five); (6) money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Thirteen); (7) conspiracy to steal and embezzle health care benefit funds, in violation of 18 U.S.C. §§ 371, 664 and 669(a) (Count Fourteen); (8) health care fraud conspiracy, in violation of 18 U.S.C. §§ 1349 and 1347 (Count Fifteen); and (9) attempted health care fraud, in violation of 18 U.S.C. § 1347 (Count Sixteen).

On September 14, 2021, all charged defendants except DiMatteo were arrested and arraigned before the Honorable Taryn A. Merkl, United States Magistrate Judge.  DiMatteo, who was not home at the time of the arrest, was alerted at approximately 6:30 a.m. that morning that law enforcement agents sought his arrest, according to cellphone records and witness interviews. One of the undersigned Assistant United States Attorneys also instructed DiMatteo's then-attorney to have DiMatteo self-surrender to an FBI agent in Florida.  Instead, DiMatteo turned off two cellphones he had used during the government's investigation.  He then used a friend's phone to contact an individual known to be a member of organized crime in Florida and arranged for another individual to pick him up and transport him to a different location.  DiMatteo eventually surrendered three days later in New York after DiMatteo's son posted a photograph of DiMatteo lounging in a pool to a social media account:



At the arraignment, DiMatteo, through counsel, consented to a permanent order of detention with leave to present a bail application. DiMatteo later moved for bail and, over the government's objection, was released to home detention on a $5 million secured bond on February 4, 2022.

On April 13, 2022, a grand jury returned a 21-count superseding indictment, which is the operative charging document and contained the same essential counts against DiMatteo.

On July 6, 2023, DiMatteo pleaded guilty, pursuant to a plea agreement with the government, to Count One of the superseding indictment. As part of the plea agreement, DiMatteo admitted to the conduct alleged in Racketeering Acts One and Six of the superseding indictment, to wit: extortion conspiracy of John Doe #1 and money laundering conspiracy, respectively.

C. The Sentencing Guidelines

The government submits that the following calculation of the Guidelines Offense Level is correct:

Count One: Racketeering

Racketeering Act 1: Extortion Conspiracy

| | |
|---|---|
| Base Offense Level (U.S.S.G. §§ 2E1.1(a)(2), 2B3.2(a)) | 18 |
| Plus: Offense Involved Threat of Bodily Injury (U.S.S.G. § 2B3.2(b)(1)) | +2 |
| Plus: Loss Greater Than $95,000 (U.S.S.G. §§ 2B3.2(b)(2), 2B3.1(b)(7)(C)) | +2 |
| Total: | <u>22</u> |

Racketeering Act 6: Money Laundering Conspiracy

| | |
|---|---|
| Base Offense Level (U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(a)(2)) | 6 |
| Plus: Intended Loss More Than $150,000 (U.S.S.G. § 2B1.1(b)(1)(F)) | <u>+10</u> |
| Total: | <u>16</u> |

Multiple Racketeering Act Analysis

| | |
|---|---|
| Highest Adjusted Offense Level | 22 |

Units:

| | |
|---|---|
| Racketeering Act 1 (U.S.S.G. § 3D1.4(a)) | 1 |
| Racketeering Act 6 (U.S.S.G. § 3D1.4(a)) | ½ |
| Total Units | 1 ½ |

      Levels Added (U.S.S.G. § 3D1.4):     +1

      Plus: Manager or Supervisor (U.S.S.G. § 3B1.1(b))     +3

      Less: Acceptance of Responsibility (U.S.S.G. §§ 3E1.1(a), (b))     -3

      Total:     <u>23</u>

PSR ¶¶ 213-35. In addition, the parties agree that an additional two-level departure is warranted for the case's global resolution by July 15, 2023. See id. ¶ 295; U.S.S.G. § 5K2.0.

      As estimated in the plea agreement, the government submits that DiMatteo is in Criminal History Category II. DiMatteo has three previous convictions: (1) a 1974 attempted assault conviction, (2) a 1985 federal narcotics conviction, and (3) a 2001 federal money laundering conspiracy conviction. See PSR ¶¶ 236-243. DiMatteo was last released from custody on his most recent conviction on January 17, 2003. Because the government can show DiMatteo's commencement of the offense of conviction began <u>before</u> January 2018, his 2001 conviction receives three criminal history points. U.S.S.G. § 4A1.2(e)(1); see also United States v. Napoli, 179 F.3d 1, 17 (2d Cir. 1999). In his executed plea agreement, DiMatteo stipulated to this criminal history, as well as in his counsel's letter to Probation. See Letter dated November 17, 2023, from DiMatteo's counsel to Probation.

      The PSR states that DiMatteo is in Criminal History Category III because it gives three points to DiMatteo's 1985 conviction. However, DiMatteo was last released from custody on his 1985 conviction on July 18, 1989, and his commencement of the instant offense began more than fifteen years after his release, <u>i.e.</u>, 2004. See U.S.S.G. § 4A1.2(k)(2) (providing that fifteen-year period for counting a criminal conviction begins on "the date of last release from incarceration on such sentence," including incarceration resulting from parole violations tied to underlying offense). Accordingly, the Court should find DiMatteo is in Criminal History Category II, as set forth in the parties' plea agreement.

      With an adjusted offense level of 23 and Criminal History II, the applicable Guidelines range of imprisonment is 51 to 63 months, and if the Court accepts the additional, two-level departure for global resolution, the defendant's Guidelines range is 41 to 51 months (CHC II x 21). PSR ¶ 295.

II.    <u>A Sentence of 46 Months' Imprisonment Is Warranted</u>

    A.    <u>Applicable Law</u>

      The Supreme Court has explained that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (internal citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the sentencing court] may not presume that the Guidelines range is reasonable. [The sentencing court] must make an

individualized assessment based on the facts presented." Id. at 50 (internal citations omitted). However, "in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" Kimbrough v. United States, 552 U.S. 85, 109 (2007); see also United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."). Indeed, the Supreme Court has held that, on appeal, a Guidelines sentence may be presumed to be reasonable because "the sentencing statutes envision both the sentencing judge and the [Sentencing] Commission as carrying out the same basic § 3553(a) objectives." Rita v. United States, 551 U.S. 338, 358 (2007). "An individual judge who imposes a sentence within the range recommended by the Guidelines thus makes a decision that is fully consistent with the Commission's judgment in general." Id. at 350. Furthermore, Guidelines sentences promote Congress' goal in enacting the Sentencing Reform Act: "to diminish unwarranted sentencing disparity." Id. at 354.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, 18 U.S.C. § 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

B. Argument

The government respectfully submits that a Guidelines sentence of 46 months' imprisonment is appropriate in view of the serious, long-running nature of the criminal conduct, the defendant's recidivism and sworn membership in a violent organized crime family, the need to protect the public, and the need for deterrence.

1. The Nature and Circumstances of the Offense

The serious and long-running nature of the criminal conduct here, as well as its nexus to a violent organized crime enterprise, warrant a significant term of imprisonment. See 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). DiMatteo's crimes were serious on account of their nature (extortion), the length and repetitiveness of the conduct, and in view of the backdrop of organized crime activity. Foremost, DiMatteo committed these crimes as consigliere (i.e., the third most powerful member) of the Colombo organized crime family, a violent criminal organization. Indeed, on wiretaps and consensually-recorded conversations, DiMatteo was referred to as "number three."[2] As consigliere, DiMatteo supervised other members of the crime family who threatened John Doe #1 for the month-after-month payments. Those threats to John Doe #1 were meaningful and instilled real fear in John Doe #1 precisely because they came with

---

[2] For example, in an intercepted telephone call on September 1, 2020 (Uvino Session No. 636), Vincent Ricciardo told Michael Uvino that he had "just got a call from number 3." Telephone records demonstrated that DiMatteo had just called Vincent Ricciardo. In another example, in consensually-recorded conversations with a Colombo crime family member on April 20 and April 27, 2021, DiMatteo was referred to as "number three."

the backing of the Colombo crime family's leadership, including DiMatteo. And DiMatteo acted with full knowledge as to who his very violent co-conspirators were, and the significant harm they posed to John Doe #1 if their wishes were not followed.

2. The Defendant's History and Characteristics

DiMatteo's history and characteristics weigh in favor of significant term of imprisonment, as well. See 18 U.S.C. § 3553(a)(1). Indeed, DiMatteo has a long history of criminal conduct dating back to the 1970s. Notably, in 1985, DiMatteo was convicted in this district of distributing a significant amount of heroin, for which he was sentenced to 96 months' imprisonment. PSR ¶ 238. Then, in 2000, DiMatteo was convicted of money laundering conspiracy and sentenced to 18 months' imprisonment in the Southern District of New York. The crime involved DiMatteo laundering the proceeds of securities fraud for members and associates of the Colombo organized crime family. Id. ¶ 239. This prior sentence did not deter him from committing additional crimes. To the contrary, DiMatteo not only continued to associate with members of organized crime, but he rose through the ranks of the Colombo crime family to become its third-most powerful member.

Indeed, while in pretrial detention at the Metropolitan Detention Center ("MDC"), DiMatteo placed several recorded telephone calls, which showed he continued to communicate with members of organized crime, sought their financial assistance, and remained involved in the affairs of the Colombo family. For instance, as captured on a recorded call made from the MDC on September 21, 2021, DiMatteo directed a family member to "go on the Avenue, see who's around and not around." The "Avenue" is a reference to the Gravesend section of Brooklyn, where many meetings occurred during the course of the government's investigation in connection to the charged scheme and where members of the Colombo crime family have been observed congregating. DiMatteo's instruction to his relative was likely an attempt to discern who was not present, thereby indicating if anyone had provided information to the government.

In another series of recorded calls, DiMatteo cautioned the same family member about law enforcement surveillance and counseled that person to avoid a garage located in the Gravesend section of Brooklyn—which, as discovery productions in this case revealed, was surveilled by law enforcement. For instance, on September 24, 2021, in a call recorded by the MDC, DiMatteo instructed his relative to "stay off the phones" because of possible FBI surveillance. On October 1, 2021, in another recorded call, DiMatteo further warned his relative to avoid the garage used by the Colombo crime family as a meeting place, saying, "that garage is like a fire over there, you know that right?"

On other recorded calls, DiMatteo also sought financial assistance from members of organized crime, demonstrating his continued connection to and influence in organized crime. Given his supervisory position, relaying such requests was effectively relaying directives for other members of the Colombo family to pay him. For instance, on September 28, 2021, in a call recorded by the MDC, DiMatteo directed a family member to contact a known member of organized crime so that members could contribute to his commissary fund:

> DIMATTEO: Tell [Member #1] to get in touch with [Member #2], everybody, see if you can get

9

> 50 dollars a month out of everybody then I can get taken care of in here so you guys don't have to go for it.

Several days later, on October 6, 2021, DiMatteo again relayed a directive for payments of the Colombo crime family.

> DIMATTEO: Tell him, those guys like on the Avenue, like [Member #3] and everybody, tell them it takes commissary to be in jail.

These communications demonstrate that DiMatteo is firmly committed to the criminal mission of the Colombo crime family, an organization which he has been associated for at least nearly two decades, and is likely to continue to associate and promote the aims of the crime family in the future.

        3.      <u>Promoting Respect for the Law and Providing Just Punishment</u>

The sentence must also promote respect for the law and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). By engaging in continued criminal activity for the Colombo family spanning decades, DiMatteo has evidenced an utter lack of respect for the law. And the long-running and intentional nature of the harm and personalization of the threats against John Doe #1 are aggravating factors that merit a serious punitive term of imprisonment.

        4.      <u>Affording Deterrence and Protecting the Public</u>

A Guidelines sentence is also necessary to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B), (C). While DiMatteo's sentencing letter asserts that he is unlikely to recidivate due to his age, his letter ignores the fact that DiMatteo has taken an oath for life to commit crimes on behalf of a violent organized criminal enterprise and his long and proven association with the crime family. Moreover, DiMatteo's role in this case as a supervisor of criminal activity proves that he is certainly capable of supervising and directing serious criminal activity even as a relatively older man. There is also a clear need to send a broader message to the public that participating in organized crime and supporting such criminal enterprises warrants serious punishment.

III.　Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a Guidelines sentence of 46 months' imprisonment and a term of three years' supervised release and award restitution to John Doe #1 in the amount of $280,890.

Respectfully submitted,

BREON PEACE
United States Attorney

By:　　　　/s/
Devon Lash
Michael W. Gibaldi
Andrew D. Reich
Assistant United States Attorneys
(718) 254-7000

cc:　Clerk of Court (HG) (by ECF)
　　　Gerald J. McMahon, Esq. (by ECF)
　　　United States Probation Officer Michelle B. Malko (by E-Mail)